IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RUSSELL COX, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| R.J. SCHINNER CO., INC., | : | CIVIL ACTION NO. |
| | : | 1:18-cv-04794-AT |
| Defendant. | : | |

## <u>ORDER</u>

This matter is before the Court on Defendant R.J. Schinner Co., Inc.'s ("Defendant") Motion for Summary Judgment. [Doc. 26.] Plaintiff brought this case under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, seeking to recover unpaid overtime compensation, liquidated and actual damages, and attorneys' fees. (Doc. 1 at ¶ 2.) For the reasons explained below, the Court finds that genuine issues of material fact exist regarding whether Plaintiff was an executive employee exempt from the FLSA's overtime requirement precluding entry of summary judgment in Defendant's favor. Accordingly, Defendant's Motion for Summary Judgment [Doc. 26] is **DENIED**.

## I.    BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of

facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.2d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, courts must review all facts and inferences in the light most favorable to non-moving party). This summary statement does not represent actual findings of fact. Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy. When the Court refers to a party's statement of material facts, the fact being referred to is undisputed by the opposing party, unless otherwise noted by the Court.

Defendant is a company that runs warehouses that store products used by food service wholesalers, paper wholesalers, janitorial/sanitary wholesalers, and grocery suppliers. (Plaintiff's Statement of Additional Material Facts, Doc. 39-1 at ¶ 1.) The Defendant maintains a Redistribution Warehouse in Atlanta, Georgia which employs approximately 22 associate warehouse employees ("Associates"), as well as a Transportation Coordinator, a First Shift Supervisor, a Second Supervisor, and an Operations Manager. (Defendant's Statement of Material Facts, Doc. 26-2 at ¶ 2, Swain Decl., Doc. 26-6 at ¶¶ 2, 7.) The daily operations at the warehouse generally involve the shipping and receiving of product from wholesalers and suppliers. (Doc. 26-2 at ¶ 3.)

Plaintiff worked as the "First Shift Supervisor" in the Defendant's Atlanta warehouse from May 23, 2018 to September 24, 2018. (Doc. 39-1 at ¶¶ 2, 3.) Plaintiff reported to the Operations Manager, Chris Swain. (Doc. 26-2 at ¶ 5.) The First Shift was comprised of 13 Associates who all reported to Plaintiff, and who

were paid on a per-hour basis. (Doc. 26-2 at ¶ 6.) The Associates were responsible for a range of manual labor tasks that are typical in the operation of a warehouse: shipping, delivering, and receiving product from wholesalers, suppliers, and customers. (Doc. 26-2 at ¶ 3.) For the Associates, the First Shift began at 6:00am and ended at 3:00pm. (Cox Deposition, Doc. 30-1 at 42.) However, for the Plaintiff, his workday typically began around 5:00am when he arrived at the facility to unlock the warehouse, turn on the lights, check his emails, and print out the information he needed to provide to the Associates when they arrived. (Cox Deposition, Doc. 30-1 at 33, Doc. 30-2 at 41.) Plaintiff testified that his workday usually lasted from 5:00am until about 6:30pm, even though the Second Shift began at 3:00pm and lasted as long as necessary for all remaining work to be completed. (Cox Deposition, Doc. 30-2 at 33, 42.) First Shift was generally responsible for all "inbound" orders while Second Shift handled all "outbound" orders. (Mahomes Deposition, Doc. 28-1 at 20.)

In a typical day, Plaintiff would write down the "POs"[1] for the day on a white board, and hold a morning meeting with all of the Associates to go over any talking points and to make sure everyone knew where they were working for that day. (Cox Deposition, Doc. 30-2 at 22, 42–44.) He would then clean an aisle in the warehouse, or help an Associate unload trucks until about 8:00am. (Cox

---

[1] Plaintiff refers to "POs" repeatedly throughout his deposition, although it is unclear to the Court from the available record what a "PO" is, or what these letters stand for. From context, the Court understands it to be a report that the Shift Supervisors and Associates use to guide their workflow for the day.

Deposition, Doc. 30-2 at 45–46.) After helping unload trucks, Plaintiff would go around to the different departments in the warehouse to make sure everyone was on task, and he would sometimes have to track down missing items or otherwise solve problems that arose, including ensuring that customers were able to receive their orders correctly. (Cox Deposition, Doc. 30-2 at 45–48.) During this time, Plaintiff also helped put product up or replenish product where needed. (Cox Deposition, Doc. 30-2 at 49–51.) While the Associates went to lunch, Plaintiff would typically continue to do the tasks that the Associates were working on, to help out. (Cox Deposition, Doc. 30-2 at 51.) Plaintiff estimated that about 85% of his day was spent performing manual labor tasks, while another 10% was spent performing "rote duties." (Cox Deposition, Doc. 30-2 at 53.) Plaintiff specified that from 6:00am until 2:00pm, he was usually performing hands-on manual labor, then he would switch over and work to "clear the queue," a task which had to be completed before he could leave for the day. (Cox Deposition, Doc. 30-2 at 38, 54.)

Unlike the Associates, Plaintiff had keys to the facility, a company cell phone, and a company credit card, all of which he was trusted to use in his own discretion, except for any very large purchases. (Cox Deposition, Doc. 30-1 at 52–54, Doc. 30-2 at 56; Swain Deposition, Doc. 27-1 at 40.) Plaintiff was also responsible for reviewing vacation time requests, verbally approving pre-shift overtime, counseling employees on occasion, and communicating with temporary staffing agencies regarding employment needs. (Cox Deposition, Doc. 30-1 at 64, 68–69, 71, 85, Doc. 30-2 at 3–5.) Plaintiff trained new Associates on "scanning" and the

"manual labor part" of their job, and he was empowered to direct Associates to fix an unsafe situation or report to a different part of the warehouse as needed. (Cox Deposition, Doc. 30-1 at 83–84, Doc. 30-3 at 10–12, 16–17.)

Additionally, there were several tasks which Plaintiff attempted to perform, but then stopped performing after doing them incorrectly. For instance, Plaintiff said that he attempted to perform the prioritization of "inbound shipping" but after he did it wrong for three days, Chris Swain took him off of that task and delegated it instead to a different employee. (Cox Deposition, Doc. 30-1 at 76.) Plaintiff also said that "one time I tried to fix a customer problem and apparently I did something wrong and I gave them something that I shouldn't had because they owed on a particular bill." (Cox Deposition, Doc. 30-1 at 99.) Plaintiff said that as a result of that, "I stopped doing that as well. I stopped trying to fix their problems. I send them to customer service [instead.]" (Cox Deposition, Doc. 30-1 at 99.) Plaintiff also testified that he "did cycle count one time and I was told I was doing it wrong and they took me off of it. They told me I couldn't do cycle counts anymore." (Cox Deposition, Doc. 30-2 at 65.) Lastly, Plaintiff discussed documentation relating to the organization of the returned or damaged product area, which occasionally involved "physically tak[ing] out the product." (Cox Deposition, Doc. 30-3 at 2–3.) Plaintiff explained that he was not allowed to use the "screen" necessary for this task, because "I did it one time and I up screwed [sic] and I couldn't do it again." (Cox Deposition, Doc. 30-3 at 2–3.)

Plaintiff testified that he typically worked Monday through Friday from 5:00am until about 6:30pm, averaging a total of 66.5 work hours per week after subtracting 1 hour per week – total – for lunch. (Cox Deposition, Doc. 30-1 at 42, Doc. 30-2 at 22–23, 32–34, 41, 59.) Plaintiff was paid on an annual salary basis, so he was not paid time-and-a-half for any hours above 40, as the Associates would have been. Plaintiff testified that he was told the job would normally require him to work 40–42 hours per week. (Cox Deposition, Doc. 30-1 at 39.)

In his Complaint, Plaintiff alleged that throughout his employment, his primary duties were "non-exempt work, including manual labor such as scanning products, manually pulling products, and stocking products." (Complaint, Doc. 1 at ¶ 8.) Plaintiff further alleged that, because his primary work duty was manual labor, he should be entitled to overtime compensation for all the hours he worked in excess of 40 hours per week. (Complaint, Doc. 1 at ¶¶ 9–10.) Defendant asserts in its Motion for Summary Judgment that the record evidence "shows no genuine dispute that [Plaintiff] was exempt from the FLSA's overtime requirements as a bona fide executive employee." (Motion for Summary Judgment, Doc. 26-1 at 1.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party, and is material if resolving the factual issue might change the suit's outcome under the governing

law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Id.*

When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. *Id.* Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case. *Id.* The non-moving party must then respond with

sufficient evidence to withstand a directed verdict motion at trial.  Fed. R. Civ. P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.   DISCUSSION

Defendant seeks summary judgment on the grounds that the undisputed material facts show that Plaintiff was properly classified as a bona fide executive employee, exempt under 29 U.S.C. § 213(a)(1) from the FLSA's overtime requirements. (*See* Def.'s Motion for Summary Judgment, Doc. 26-1.)

The FLSA, which was enacted to protect the health, efficiency and welfare of workers in the United States, requires employers to pay overtime (time and a half) to employees who work more than forty hours per week. 29 U.S.C. § 207(a)(1). However, Section 213(a)(1) exempts from this requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Keeping in mind the comprehensive remedial purposes of the FLSA,[2] the Court interprets its provisions neither liberally nor narrowly, but instead gives its provisions a "fair interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (quoting Antonin Scalia & Bryan Garner,

---

[2]  The primary purpose of the FLSA is the protection of the nation's employees from detrimental labor conditions and to provide a minimum subsistence wage. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945), *reh'g denied* 325 U.S. 893; *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1363 (11th Cir. 1997); *see also* 29 U.S.C. §§ 202(a), 206, 207, 212.

Reading Law, 363 (2012)). The employer bears the burden of proving its entitlement to an exemption. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008); *Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 965 (11th Cir. 1997). For Defendant to prevail, it must prove the applicability of the exemption by "clear and affirmative evidence." *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992).

As a job title is of little use for exemption purposes, courts look to the test articulated by the Department of Labor's ("DOL") regulations under the FLSA in assessing the applicability of the executive exemption. *See Morgan*, 551 F.3d at 1265–66. The Court examines the executive exemption below.

## A.   Executive Exemption

The FLSA's executive exemption applies to an employee: (1) who is compensated on a salary basis at a rate of not less than $455 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;[3] (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees, or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[4] 29 C.F.R. §

---

[3] "When an enterprise has more than one establishment, the employee in charge of each establishment may be considered in charge of a recognized subdivision of the enterprise." 29 C.F.R. § 541.103(b).

[4] "To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the

541.100(a). The parties agree that Plaintiff earned a salary of $49,500.00 per year (approximately $951.92 per week), and that the first element of the executive exemption test is therefore met. However, there is significant disagreement about the remaining prongs, and the second prong in particular. (Resp., Doc. 39 at 8.)

### Prong 2: Plaintiff's primary duty was management of the enterprise in which he was employed

The Eleventh Circuit has rejected a "categorical approach" to deciding whether an employee is an exempt executive. *Morgan*, 551 F.3d at 1269, 1272 (citing *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (2008) (refusing to hold that store managers are exempt employees "as a matter of law" simply because the employee had responsibility over a free-standing business location)). Instead, the primary duty inquiry is "necessarily fact-intensive," consistent with the relevant Department of Labor regulation. *Rodriguez*, 518 F.3d at 1264; *Morgan*, 551 F.3d at 1269, 1272; 29 C.F.R. § 541.700(a) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."). The exemption should "be applied only to those [employees] clearly and unmistakably within the terms and spirit of the exemption." *Morgan*, 551 F.3d at 1269 (quoting

---

employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon . . . . It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

*Brock v. Norman's Country Market*, 835 F.2d 823, 826 (11th Cir. 1988) (internal quotation omitted)).

The Department of Labor regulations implementing the FLSA give these examples of "management" activities:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. "Primary duty" is defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining the primary duty of an employee the Court considers several factors: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* The Court must employ these factors, and look beyond the employee's mere job title. *Barreto v. Davie Marketplace, LLC*, 331

F. App'x 672, 674 (11th Cir. 2009) ("This analysis specifically requires an examination beyond an employee's title to the specific duties performed by the employee.").

The amount of time an employee spent performing exempt work is useful in determining whether exempt work is the primary duty of an employee, but it is not dispositive of the primary duty issue. *See* 29 C.F.R. § 541.700(b) (noting that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement" and that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion"); *Morgan*, 551 F.3d at 1270.

The Eleventh Circuit analyzed the "primary duty" issue under fairly similar factual circumstances as here and found that the question of whether the employee was exempt was one for the jury where there was evidence that (1) the store manager spent 80 to 90 percent of his time performing nonexempt, manual labor (such as stocking shelves, running the cash registers, unloading trucks, and cleaning the store) and only 10 to 20 percent of his time performing exempt managerial type work, (2) the store manager was expected to perform a significant amount of manual labor that was not merely an incidental portion of a managerial job, (3) the store manager rarely exercised discretion because either the company's guidelines or the area/district managers' directives controlled virtually every aspect of the store's day-to-day operations, (4) the store manager had little

freedom from direct supervision or oversight, and (5) the store manager's salary or effective hourly wage was only slightly higher than his non-exempt co-workers. *See Morgan*, 551 F.3d 1233 (denying employer's post-trial motion for judgment as a matter of law and affirming jury verdict in favor of employee); *Rodriguez*, 518 F.3d 1259 (same); *Barreto,* 331 F. App'x 672 (vacating district court's grant of summary judgment for employer where the evidence, when viewed in the light most favorable to the employee, demonstrated questions of fact as to whether the employee's "primary duty" consisted of management).

In *Rodriguez*, even though the Court agreed with the employer that it presented abundant documentary evidence and testimony at trial indicating that the store managers' primary duty was management, the Court held that there was also sufficient evidence from which a reasonable jury could have determined that that the store managers' primary duty was not management. 518 F.3d at 1264–65. Specifically, the Court found the following evidence as a whole was enough for a reasonable jury to conclude that the primary duty of the store managers was not management: (1) testimony from managers that they spent no more than 10 percent of their time on management-related duties and the majority of their time engaging in sales and sales-related duties such as customer service, merchandise receiving, and stacking shelves; (2) testimony from store managers that they lacked authority and discretion over their respective stores and employees, the stores were actually run by district managers, and they could not make any management decisions without first seeking approval from their district managers,

and (3) testimony that the managers' hourly rate of pay (computed by dividing their weekly salary by the number of hours they worked each week) was comparable to those of the sales associates or assistant managers in their stores. *Id.* at 1265.

In the instant case, Plaintiff testified that he spent approximately 85% of his time on nonexempt, manual labor such as stocking the warehouse, unloading trucks, and cleaning aisles. (Cox Deposition, Doc. 30-2 at 54.) Defendant disputes this estimate however, saying that "the Company maintains records of all items employees pick and put-away, (i.e., manual labor for putting away and obtaining product)" and that those records show Plaintiff "spent 69.99 hours during his *entire* employment picking and putting away 3285 lines of product." (Motion for Summary Judgment, Doc. 26-1 at 20 (citing Cox Deposition, Doc. 30-1 at 49–50, Doc. 30-2 at 19; Swain Decl., Doc. 26-6 at ¶ 26, Exhibit B, Doc. 26-6 (Pick Report))(emphasis in original).) The Defendant says that, "even assuming Cox worked 60 hours a week as he asserts (which the Company does not concede), this amounts to less than 7% of his 17 weeks of employment." (Doc. 26-1 at 20.) Plaintiff responds to this argument by saying that the report relied on by Defendants is not a reliable record, and that it does not capture the time spent moving from one product to the next while performing put-away duties, so it fails to capture the actual amount of time spent on this tasks. (Response, Doc. 39 at 13.) Plaintiff also responds that these reports only show one type of manual labor (picking and putting away product), and that they fail to show the time Plaintiff spent unloading

trucks, searching for missing items, moving products that were placed in the wrong location, dealing with damaged products, or cleaning, among other things. (Doc. 39 at 13–14.)

Plaintiff's counterpart Shift Supervisor on the Second Shift, Donnell Mahomes, testified that Second Shift began at 3:00pm, but that he was specifically required to keep the Second Shift on duty until all of their work was completed, which sometimes ran overnight and into the early hours of the following morning. (Mahomes Deposition, Doc. 28-1 at 8–9, 21.) Mr. Mahomes estimated that he worked between 60 to 70 hours per week. (Mahomes Deposition, Doc. 28-1 at 17.) He further testified that he spent "[m]aybe 35 to 40 percent" of his time finding freight that was misplaced or is incorrect in the system inventory, "25 to 30 percent" of his time picking orders (the primary task performed by the Associates), and "25 percent" of his time completing paperwork.[5] (Mahomes Deposition, Doc. 28-1 at 15–17.) In sum, there is a genuine dispute here regarding how much time Plaintiff actually spent on manual labor tasks versus managerial tasks. However, as noted above, the amount of time spent performing exempt work is not necessarily dispositive of the primary duty issue. *See* 29 C.F.R. § 541.700(b).

As for the other elements considered by the court in *Rodriguez*, Plaintiff had one direct supervisor, Chris Swain, the Operations Manager, who also supervised

---

[5] Plaintiff characterizes all of these tasks as non-exempt work, including "finalizing paperwork" which Plaintiff defines as "simply printing invoices, stapling & sorting them, and placing them in envelopes." (*See* Response, Doc. 39 at 14.)

Mr. Mahomes on the Second Shift.[6] (Swain Deposition, Doc. 27-1 at 6–7.) Mr. Swain was in turn supervised by Derek Dellwo. (Cox Deposition, Doc. 30-1 at 88–89.) Plaintiff testified that he did not really employ any discretion even in the managerial aspects of his position, because he simply took the information from the POs created by another employee and wrote it on a white board, and the Associates already knew where to go and what to do with that information. (Cox Deposition, Doc. 30-2 at 42–43.) Plaintiff did testify that he was able to independently oversee the day-to-day tasks of the Associates, sign off on time-off requests, approve pre-shift overtime, and discuss staffing needs with temporary staffing agencies. (Cox Deposition, Doc. 30-1 at 64–65, 68–69, 69–70, 71, 85, Doc. 30-2 at 3–5.) Defendant argues that "the evidence shows Cox performed and was responsible for several management tasks throughout the entire day, including ensuring his associates were performing the correct tasks, completing their duties, monitoring inventory and shipment records, and maintaining safety standards." (Motion for Summary Judgment, Doc. 26-1 at 22.) Defendant argues that Plaintiff's greatest value to the company was his managerial work, as evidenced by his rate of the pay – which the Defendant describes as "significantly more than hourly employees[,]" – as well as by the company trusting Plaintiff with additional responsibilities that the Associates did not have, including some which impacted the company's business and success. (Doc. 26-1 at 22.)

---

[6] Mr. Swain's position was titled "Warehouse Manager" during the time of Plaintiff's employment, but was changed at some point in 2018, although the duties and role remained the same. (Swain Deposition, Doc. 27-1 at 6–7.)

Mr. Swain testified that the Associates were typically paid in the range of $14.25 per hour to $17.00 per hour, and that they usually worked between 38 and 45 hours per week, with any hours above 40 compensated at an overtime rate of time-and-a half. (Swain Deposition, Doc. 27-1 at 8–9.) The Associates therefore typically made between $541.50 and $807.50 per week, depending on their particular salary and hours worked.[7] Plaintiff was paid $49,500 per year, which is approximately $951.92 per week, or roughly between 117%–175% of the typical Associate's weekly pay. However, the Eleventh Circuit's decision in *Rodriguez* counsels that this Court not look at pure take-home pay as a controlling salary factor – but instead, consider as a salary measure in conjunction with other factors, the plaintiff's *effective hourly* rate of pay. Here, this analysis calls for dividing the Plaintiff's weekly salary by the number of hours he worked each week, and comparing that to the hourly rate of the Associates to determine if the wage rate was comparable to those of the sales associates or assistant managers in their stores. 518 F.3d at 1265. Plaintiff testified that he typically worked Monday through Friday from 5:00am until about 6:30pm, averaging a total of 66.5 work hours per week after subtracting 1 hour per week total for lunch. (Cox Deposition, Doc. 30-1 at 42, Doc. 30-2 at 22–23, 32–34, 41, 59.) At a rate of $951.92 per week, 66.5 hours worked yields an effective hourly rate of roughly $14.31 per hour. This would put Plaintiff's compensation rate at the very low end of the scale compared to the

---

[7] 38 hours multiplied by $14.25 equals $541.50 at the low end of the range, while 40 hours at $17.00 per hour plus 5 overtime hours at the overtime rate of $25.50 equals $807.50 at the high end of the range.

Associates he oversaw. Defendants dispute that Plaintiff actually worked so many hours per week, pointing to several of the end of day reports Plaintiff emailed to Mr. Swain which indicated when Plaintiff stopped working for the day. (*See* Response to Plaintiff's Statement of Facts, Doc. 44 at ¶ 5 (listing 29 instances on which Plaintiff sent end of day email to Mr. Swain between 3:12pm and 6:01pm); *see also* Swain Deposition, Doc. 27-1 at 48–49 (Plaintiff sent end of day reports "about 50 percent of the time."), *and* Emails, Doc. 26-3 at 150–151.)

The Eleventh Circuit in *Barreto* reversed a district court's grant of summary judgment to an employer  under the FLSA's executive employee exemption, noting that "where an employee spends the majority of his time on non-exempt work and has admittedly few managerial-type obligations, there is at least a factual question as to whether the non-exempt duties are comparatively more important than the exempt duties. Such determinations of fact in the face of conflicting evidence are within the exclusive province of a jury." 331 F. App'x at 675, n. 1 (citing *Morgan*, 551 F.3d at 1269). Thus, it is clear that "[w]here an issue turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance," and judgment as a matter of law is therefore not appropriate. *Rodriguez*, 518 F.3d at 1264–65; *also Morgan*, 551 F.3d at 1269.

There is a genuine dispute here about both how much time Plaintiff spent working in total, and how much time Plaintiff spent on manual labor tasks versus managerial tasks. Based on the record of evidence here, when viewed most

favorably to Plaintiff, there is evidence on both sides of the question as to whether Plaintiff's primary duty was managerial or not. Accordingly, the question must be submitted to the factfinder for a determination, and Defendant's Motion for Summary Judgment is therefore **DENIED**.

All four prongs of the FLSA's executive exemption must be demonstrated in order to apply. 29 C.F.R. § 541.100(a). Even though Defendant's motion is already deemed not sustainable, the Court examines the remaining factors for the sake of completeness.

### Prong 3: Plaintiff customarily and regularly directed the work of two or more other employees

There is no genuine disagreement as to the fact that Plaintiff customarily and regularly directed the work of up to 13 Associates, although Plaintiff asserts that it was Mr. Swain who "assigned Associates their regular duties." (Response, Doc. 39 at 20.) The First Shift was comprised of 13 Associates, all of whom reported to Plaintiff as their direct supervisor for a range of issues including some aspects of training, approval of overtime or time-off requests, counseling regarding on-the-job issues, or problems relating to the performance of their daily tasks. (Cox Deposition, Doc. 30-1 at 51, 83, 84–85, Doc. 30-2 at 4–5, 22.) Plaintiff held morning meetings where he discussed any company talking points, and ensured that the Associates all knew where they were supposed to be that day. (Cox Deposition, Doc. 30-1 at 84, Doc. 30-2 at 22.) Plaintiff also was responsible for informing the Associates of each day's schedule. (Cox Deposition, Doc. 30-2 at 42.)

Throughout the day, Plaintiff was also responsible for ensuring the Associates were completing the right orders and transfers and pulling the correct product. (Cox Deposition, Doc. 30-2 at 46, 48.) No rational factfinder could find that Plaintiff did not customarily or regularly direct the work of two or more other employees. The third prong therefore is met based on the record presented at this juncture.

### Prong 4: Plaintiff's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.

Plaintiff testified that he made several recommendations during his tenure, relating to issues of safety, best practices, and efficiency, but that none of the recommendations were adopted. (Cox Deposition, Doc. 30-1 at 79–82 and Doc. 30-2 at 65–66, Doc. 30-2 at 72, Doc. 30-3 at 6, 19.) Defendants contest this, saying that on Plaintiff's first day, he recommended an Associate be disciplined for unsafe behavior, and that Associate was subsequently disciplined. (Motion for Summary Judgment, Doc. 26-1 at 24; *see also* Cox Deposition, Doc. 30-2 at 4–5 (discussing recommending discipline for employee who was subsequently written up).) Defendants also say that some of Plaintiffs recommendations were adopted by the company, and that even the recommendations made by Plaintiff which the company declined to enact were given serious consideration and were not employed for business reasons. (Reply, Doc. 42 at 18–19; Swain Declaration, Doc. 26-6 at ¶¶ 21–25.) The Defendant says that Plaintiff did have hiring and firing power, although Plaintiff testified that he was never told he had such authority. (Motion for Summary Judgment, Doc. 26-1 at 24 (citing Swain Declaration, Doc.

26-6 at ¶¶ 12–14); Response, Doc. 39 at 30 (citing Cox Declaration, Doc. 39-7 at ¶ 47); *see also* Reply, Doc. 42 at 19–20 (citing Second Swain Declaration, Doc. 42-1 at ¶¶ 3–6 (Saying he invited Plaintiff to participate in the hiring of two associates but Plaintiff said that he did not have an interest in participating in the hiring decision.).)

The Department of Labor regulations implementing the FLSA guide application of the executive exemption as follows:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon . . . . It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105. The Defendant asserts that it gave Plaintiff's suggestions and recommendations "particular weight," although over the course of Plaintiff's tenure with the company it only adopted one of his recommendations – the discipline of an Associate on Plaintiff's first day. (Reply, Doc. 42 at 18–21, Doc. 26-1 at 24.) However, Plaintiff testified that he believed that Associate was already being written up for tardiness issues, and that Plaintiff's recommendation did not

play into the decision to discipline the Associate. (Cox Deposition, Doc. 30-2 at 5 ("My influence had nothing to do with him sending him home. He sent him home purely because he had already wrote him up for being tardy and ... calling out too many times.").) As Plaintiff's term of employment was relatively short, it is difficult to appraise just how much weight the company gave his other suggestions relating to efficiency and process improvement on the current record. A reasonable jury could interpret the record of evidence as coming out on either side of this question, lending further support to the denial of Defendant's motion.

## IV.   CONCLUSION

Whereas genuine issues of material fact exist regarding whether Plaintiff was an executive employee exempt from the FLSA's overtime requirement, Defendant's Motion for Summary Judgment [Doc. 26] is **DENIED**. The Court **ORDERS AND REFERS this case to mediation with the next available magistrate judge on the rotation wheel.** Mediation shall be completed by June 15, 2020. The parties shall notify the Court of the status of the case within 5 days of the conclusion of the mediation.  If a settlement agreement is not reached, the parties' proposed Consolidated Pretrial Order shall be due on July 20, 2020.


**IT IS SO ORDERED** this 28th day of April, 2020.


**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**